Filed 4/28/15  P. v. Bradshaw CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SHAWN GREGORY BRADSHAW,<br><br>    Defendant and Appellant. | F068007<br><br>(Kings Super. Ct. No. 12CM4054)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Robert S. Burns, Judge.

Peter Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Marcia A. Fay, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Shawn Gregory Bradshaw was convicted of attempted murder (Pen. Code, §§ 664/187, subd. (a))[1] and two counts of robbery (§ 211), with multiple firearm enhancements (§ 12022.53, subds. (b) & (c)) and prior conviction allegations (§ 667, subd. (a); § 667, subds. (b)–(i)) for his role in the armed robberies of Jorge Morales (Morales) and Samuel Perez (Perez). Jessica Garcia (Garcia) and Jacob Herrera (Herrera) were also involved in the offenses but were not tried with defendant. Garcia pleaded guilty to robbery and testified for the prosecution. The record is silent as to the disposition of Herrera's case. Defendant was sentenced to 60 years four months in prison.

On appeal, defendant raises several evidentiary, instructional, and sentencing issues. He contends the court should have stricken portions of Garcia's testimony as inadmissible opinion evidence; there is insufficient evidence that he attempted to murder Perez; and the jury was improperly instructed that Garcia was an accomplice. As for the sentencing issues, defendant argues his attorney was prejudicially ineffective for failing to accept an alleged stipulation from the prosecutor, which would have resulted in a lesser sentence; the court improperly imposed consecutive sentences for the substantive offenses and the firearm enhancements; and the instruction for the firearm enhancements omitted an element.

We affirm.

## FACTS

Mellie's Market is a liquor store on Sixth Avenue in Kingsburg. There are two structures behind the store: A building with a kitchen and bathroom, and a separate

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

structure where Jorge Morales lived. A small patio was between the store and the rear structures.

At the time of the robbery, Morales had been involved in a relationship with Garcia for a few weeks. Morales knew her as "Angelica." Morales frequently gave her money to help her. Morales testified he loaned Garcia about $500 so she could return to her family in Texas. Garcia promised to repay the loan after she returned to Texas.

Morales testified Garcia asked for more money because she claimed she was pregnant and Morales was the father. Morales believed she was lying. About a week before the robbery, Garcia introduced Morales to Jacob Herrera, and said Herrera was her "brother." Garcia asked Morales for $50 to give to her "brother."

**Garcia, Herrera and Defendant**

Garcia testified Morales gave her $200 for a plane ticket to Texas. He also gave her money for other things when she asked for it, and Garcia thought he was very generous. However, Garcia testified she wanted even more money from him. She falsely claimed she was pregnant and needed more money. Morales refused.[2]

Garcia testified Herrera was her cousin. Garcia told Herrera that Morales gave her money whenever she asked for it. Herrera urged her to get more money from Morales if she could do it. They had a couple of conversations when Herrera told her to get whatever she could out of Morales.

Garcia testified that on July 30, 2012, she got into Herrera's maroon truck because they were going to Morales's house. Herrera's girlfriend and another girl were in the

---

[2] Garcia testified for the prosecution while in custody after entering a plea for her participation in the robbery of Morales and Perez. She was sentenced to three years. She was a reluctant witness and was ordered to testify. Garcia admitted that when she initially gave a statement in this case, she falsely claimed she had been forced to participate in the robbery. Garcia testified she was not forced to do anything that day.

3

truck. Herrera was driving, and he stopped to pick up defendant. Garcia knew defendant was Herrera's friend and had met him before.

Garcia testified that the original plan was that she was going to ask Morales for more money rather than rob him. However, Garcia also testified that when she got into Herrera's truck, she knew they were going to rob Morales. "I mean when you go—how do I explain it. When you go to rob somebody, I mean, you have an idea of what's going to happen. You just already know." "I knew we were going to rob him. Well, I was going to ask for it. If he didn't give it to me, we were going to take it."

Garcia testified defendant had a gun when he got into the truck. As Herrera drove to the market, Garcia testified they talked about the "situation," and she said that she would rob Morales. Garcia was ready to do it on her own. Instead, Herrera told her to knock on the door and they would take care of it.

Garcia was concerned about defendant's gun and told the others that she did not want anything stupid to happen or things to get out of hand: "I didn't want nobody to die or nothing." Herrera told her: " 'We already know, cuz, just chill.' " Garcia was under the influence of methamphetamine that night.

During the drive, Herrera told Garcia to call Morales. Garcia called and Morales said he was taking a shower. Garcia told Morales she was going to visit him, and he said that was okay and they could talk.

**The Patio**

On the evening of July 30, 2012, Lindsay Constant (Constant) and her husband arrived at Mellie's Market with their friend, Kenneth Mullins. They sat in the patio area and visited with Morales and his friend, Perez. Constant had soft drinks while the men drank beer.

4

Sometime around 9:00 p.m., Morales left the patio, went into the rear building, and took a shower. Perez borrowed Morales's cell phone and went to the adjacent garden to call his family. Constant and her companions remained on the patio.

**Garcia and Herrera Arrive on the Patio**

Garcia testified that when they arrived at the market, Herrera parked on the side of the building. There were two other cars there. Garcia got out of the truck and headed to the house. Herrera and the others initially stayed with the truck. Herrera raised the hood on his truck and pretended something was wrong with the engine.

Constant testified that she was still sitting on the patio with her husband and Mullins when Garcia arrived. Garcia asked for Morales. Constant said Morales was in the house. Garcia went into the house, and Constant never saw her again. However, Constant heard Garcia ask Morales if she could borrow his cell phone.

Garcia testified she went inside the house and entered the bathroom. She briefly spoke to Morales, who was still in the shower, and asked if he was almost done. Morales said yes, and Garcia left the bathroom. Morales heard Garcia leave through the door, and he never saw Garcia again that night.

Constant testified that about two minutes after Garcia went into the house, Herrera arrived on the patio. He was talking on his cell phone. Constant's husband said: "What's up, man. [Morales] is inside." Herrera remained on the cell phone and walked into the house.

Garcia testified that after she left the bathroom, she went into Morales's bedroom. She put down her cell phone and looked around for his wallet. Garcia heard "a ruckus" outside. Herrera entered the room, told her to leave, and said they "got it." Garcia walked out and mistakenly left her cell phone in Morales's bedroom.

5

**Defendant Arrives on the Patio**

Constant testified that a few minutes after Herrera went into the house, he returned outside and walked out of the patio gate. Shortly afterward, however, Herrera walked back to the patio, and defendant was with him.[3]

Constant testified that when defendant arrived, he immediately started to grab at his waist "like he had a gun in his waistband," but Constant never saw a weapon. Defendant told Herrera: " 'What the f**k? You never said anything about these people being here,' " referring to Constant and her companions. Herrera told defendant not to worry about them, " 'They're cool, let's just go.' " Defendant and Herrera walked into the house.

**Constant and Her Companions Leave**

After defendant and Herrera went into the house, Constant heard the two men bang on the bathroom door and tell Morales to come outside. Constant heard the sound of the shower but did not hear Morales make any reply. Constant became afraid and told her husband they should leave. Constant, her husband, and Mullins left the patio and walked to their cars, which were parked in front of the store.

Constant testified defendant and Herrera walked out of the house toward a burgundy truck parked near the store. Garcia was not walking with them. Constant thought there were three more people in the truck. Defendant and Herrera said their truck's battery had died, and asked Mullins for a jump start. Mullins drove his car up to their truck, but no one had jumper cables. Mullins drove away in his car, and Constant and her husband left in their own car.

---

[3] Constant did not know defendant or Herrera. During the investigation, she identified them as the two suspects from photographic lineups.

Constant testified they left about 10 to 15 minutes after Garcia, defendant, and Herrera had arrived. Constant never saw a gun or heard any gunshots while they were there. Defendant and Herrera were standing by the truck when Constant drove away.

**Robbery of Perez (Count II)**

In the meantime, Perez was still standing outside the building, using Morales's cell phone and talking to his family. Defendant and Herrera approached him. They asked Perez where Morales was. Defendant and Herrera went into the house, and Perez continued with his cell phone conversation.

Perez testified the men suddenly returned outside. Herrera hit Perez in the ear and knocked him down. Perez dropped Morales's cell phone and fell to the ground. Both men got on top of Perez. Herrera put a knife to his chest. Defendant pulled a gun from his waist and placed it against Perez's chest. One of the men told Perez to " 'give me everything.' " The two men took Perez's wallet, which contained $120 in cash, a check for $430, his bank cards, and his identification.[4] They picked up Morales's cell phone from the ground, and took two other cell phones from Perez's pockets.

Perez testified the men told him not to get up or move or they would shoot him. "They said if you move we will shoot you." The two men went back into the house, and one man stood near the door.

**Robbery of Morales  (Count III)**

Morales testified that after he briefly spoke to Garcia, he got out of the shower, got partially dressed, and walked out the bathroom holding the rest of his clothes. Morales discovered Herrera and an African-American man were waiting for him. Morales

---

[4] Perez testified he subsequent determined that someone used his bank cards to withdraw $400 from his accounts, but the bank returned the money to him.

7

recognized Herrera as Garcia's "brother," but he did not know the second man. Defendant was subsequently identified as the second man.[5]

Morales testified Herrera pulled a folding knife with a six-to-eight inch blade, and pointed it at his chest. Defendant had a gun, which appeared to be a nine-millimeter semiautomatic weapon. Defendant placed the muzzle on Morales's forehead. Defendant told him not to move and took his wallet, which contained $700. Herrera hit Morales in the face.

## Attempted Murder of Perez (Count I)

As Morales was being robbed, Perez was still lying on the ground in the garden area. He decided to escape. He got up and started to run toward a neighbor's house.

When he had run about 25 to 30 meters, Perez heard one gunshot fired, but he was not hit. Perez believed the shot was fired at him because "I was the one who ran that way and there was no one else." Perez did not see who fired the shot, but he knew that defendant had the gun.

Morales testified defendant and Herrera went outside after they robbed him. Morales saw defendant fire one shot at Perez as he tried to run away. "I was there in front when [defendant] fired at [Perez]." Morales testified he actually saw defendant fire the gun. Morales believed defendant was firing at Perez because Perez was trying to run away, and defendant "pointed it towards where [Perez] was running."

Garcia testified that when she left Morales's house, she saw Perez lying on the ground. She went to Herrera's truck. A few minutes later, she headed back to the house and saw Morales walk out with Herrera. Herrera hit Morales, and he fell to his knees.

---

[5] It was stipulated that Morales was shown two photographic lineups, defendant's photograph was in one of the lineups, Morales identified two different people as the gunman, and he did not select defendant. However, Garcia testified the two men who confronted Morales were Herrera and defendant.

8

Herrera told her to get out of there. She heard two gunshots and ran back to the truck. She could not see defendant when she heard the gunshots.

Morales testified that when he heard the gunshots, he took two steps toward Perez to find out if he was okay. Defendant told him not to move, and Morales stopped. Defendant reached down where he was standing, and Morales believed defendant was trying to pick up a casing from the ground. Defendant and Herrera ran toward their truck and quickly drove away.

## After the Robbery

Garcia testified defendant and Herrera got into the truck, and Herrera sped away and the tires were squealing. Defendant and Herrera passed the gun back and forth, and Herrera's girlfriend placed the gun in the truck's center console. Garcia testified she was "a little shaken up" from the incident, but "[i]t wore off after a minute" and "everything was cool."

While they were driving away, Garcia realized she left her cell phone in Morales's room. Herrera said she was "a dumb ass." Defendant said to forget about it since the incident was over. Instead, everyone discussed how much they got and how they were going to split it. Defendant had Morales's wallet and removed the cash. Defendant had the credit cards and cell phones. Herrera and defendant each gave $100 to Garcia as her share. Garcia gave her share back to Herrera so he could purchase methamphetamine for her. Herrera gave a credit card to one of the girls who had been in the truck, and told her to put some money on her boyfriend's "books" in jail.

**The Investigation**

Brent Lunde lived near the market. He heard two or three gunshots followed by chaotic yelling. He saw "the shadows" of three people run toward a car, which took off from the area. Lunde called the sheriff's department.[6]

After the suspects left, Morales went into the house and discovered his personal property had been removed from his backpack and scattered. His identification papers were missing. He also discovered that someone left behind a red cell phone.

The officers did not find any bullet casings at the scene. Morales gave them the cell phone which he found in his room. The cell phone contained photographs of Herrera and Garcia. A photographic lineup was prepared which included Herrera's photograph. Morales identified Herrera as one of the robbers.

On September 26, 2012, Herrera was arrested on an outstanding warrant. He was advised of his rights and interviewed about the robbery of Morales. As a result of the interview, defendant became a suspect. Lindsay Constant identified both defendant and Herrera from separate photographic lineups. Constant clarified that defendant was the man who grabbed at his belt when he arrived on the patio. Garcia was arrested in Texas and confirmed the identifications of defendant and Herrera. She further confirmed that defendant had the gun in the truck. Morales looked at photographic lineups with defendant's picture and identified someone else as the second suspect.

Saranise Johnson was one of the people in the truck with Garcia, defendant, Herrera, and Herrera's girlfriend. Johnson testified they went to visit Garcia's boyfriend,

---

[6] In his opening brief, defendant states that that defendant, Herrera, Garcia and the others sped away in the red truck just after Mullins had offered to give them a jump start. However, the entirety of the record suggests that the exchange about jump-starting Herrera's truck occurred before the robberies and attempted murder. Constant testified she never heard any gunshots and defendant and Herrera were still standing by the red truck when she drove away; and Brent Lunde testified that he heard the gunshots, saw three people run to a vehicle, and then the vehicle sped away.

she never heard anyone talk about a robbery, and she never saw a gun. When they arrived at the market, she stayed in the car with Herrera's girlfriend. Garcia got out first, and Herrera and defendant followed her. Johnson testified she heard a loud noise like a door being slammed, and she was "not sure if it was a gunshot or not." She did not know what happened at the market. Garcia, Herrera, and defendant ran back to the truck, they were excited, and Herrera quickly drove away. Herrera gave her a credit card, however, and she used it to put money on her boyfriend's jail account.[7]

**Convictions and Sentence**

After a jury trial, defendant was convicted of count I, attempted murder of Perez; count II, robbery of Perez; and count III, robbery of Morales with the personal use of a firearm (§ 12022.53, subd. (b)). As to all counts, the jury found defendant personally and intentionally discharged a firearm in the commission of the offenses (§ 12022.53, subd. (c)). Defendant admitted one prior strike conviction and one prior serious felony conviction. Defendant was sentenced to an aggregate term of 60 years four months.

## DISCUSSION

### I. Admission of Garcia's Testimony

As noted above, Garcia testified for the prosecution while in custody after entering a plea for her participation in the robberies. Defendant contends the court should have excluded Garcia's responses to the prosecutor's redirect examination questions when she described her belief about what defendant's role was going to be in the planned robbery of Morales. Defendant argues Garcia's testimony amounted to inadmissible speculation and opinion from a lay witness, and the court should have stricken her responses.

---

[7] Johnson had prior misdemeanor convictions for giving a false identification and theft of checks, and was facing charges for using the stolen credit card in this case.

11

## A. Background

Defendant's argument is based on a portion of the prosecutor's redirect examination of Garcia. In order to evaluate that sequence, however, we must also review Garcia's testimony on direct and cross-examination.

On direct examination, Garcia testified that Herrera repeatedly told her to get more money out of Morales. Garcia testified that she joined Herrera and his friends in the truck that evening because she knew they were going to rob Morales. They picked up defendant, and he had a gun. Garcia testified she offered to rob Morales. Herrera told her that they would do it instead. Garcia testified that defendant knew what was going to happen:

"Q. How did [defendant] know what was happening?

"A. Probably just followed the gist. I don't know. I didn't ask. It just happened.

"Q. Nobody asked any questions?

"A. Huh-uh. It just happened."

On cross-examination, defense counsel pressed Garcia about whether defendant knew what Garcia and Herrera were planning:

"Q. Even though you didn't discuss it, you understood if you didn't get the money they were going to rob him?

"A. There you go, yes.

"Q. Okay. [¶] What would lead you to believe that some stranger that you don't know very well [referring to defendant] would do that? What would lead you to believe that?

"A. Because.

"Q. Okay. You're not answering the question, so let me finish on here?

"[THE PROSECUTOR]: Your Honor.

12

"THE COURT: Hang on.

"[THE PROSECUTOR]: Excuse me. There was a question pending and the witness was thinking of the answer.

"THE COURT: Okay.

"[DEFENSE COUNSL]: She's not answering it so I'm withdrawing it.

"THE COURT: You're withdrawing the question?

"[DEFENSE COUNSEL]: Right."

Defense counsel again asked Garcia to clarify her conversation with Herrera:

"Q. …The way I understand what you're saying is, 'We didn't discuss it but I understood it to mean that if [Morales] didn't give money that everybody was going to rob him.' That's your understanding, right?

"A. Yes.

"Q. Okay, but [defendant] never participated in that conversation, did he?

"A. No, he didn't. [¶] … [¶]

"Q. Okay. So your plan was to take the money if he didn't come across with it freely, correct?

"A. I wasn't going to be able to because I'm a girl, so that's where Jacob [Herrera] and [defendant] came in the picture.

"Q. Okay. That's what you believed?

"A. That's what I believed.

"Q. That [defendant] was there and would do this?

"A. Yes.

"Q. But [Herrera] and [defendant] never discussed that in your presence, right?

"A. No."

13

Defendant's claim of error is based on the following sequence from the prosecutor's redirect examination:

"Q.     [I]t seems very clear that you're going to go in and you were going to try and get money from [Morales], and if he did not give you what you wanted that the other two were going to come in; do I have this right?

"A.     That's correct.

"Q.     And that was your understanding?

"A.     That's correct.

"Q.     In fact, you had discussed that with [Herrera] beforehand?

"A.     That's correct.

"Q.     Okay.  And you said, was it your testimony that, that the defendant was not there during that discussion between you and [Herrera]?

"A.     That is correct.

"Q.     Okay.  [¶]  But you seemed so sure that [defendant] understood that he was going to come in if you couldn't get the money.  Do I have this right?

"A.     That's correct.

"Q.     And when you were asked the question you were thinking— *can you explain to us how you know that the defendant knew he was going to come in as an enforcer*?

"A.     *I can't explain it.  We just knew*.

"Q.     And, in fact, that's what happened, right?

"A.     That is what happened."  (Italics added.)

Defense counsel immediately objected to Garcia's answer as a "legal conclusion." The court overruled the objection.  The prosecutor turned to another subject.

14

## B. A Lay Witness's Testimony

Defendant contends the court should have granted his objection to the prosecutor's question and Garcia's answer, as italicized above, that she knew defendant was going to be the "enforcer." Defendant asserts Garcia lacked personal knowledge of this fact, as required for her response to be admissible pursuant to Evidence Code section 702, subdivision (a). Defendant further asserts Garcia's opinion usurped the jury's function because she was not an expert, she was not qualified to give her opinion about what defendant believed, and she effectively told the jury to reach the legal conclusion that defendant acted as the "enforcer" during the robbery.

"One of the fundamental theories of the law of evidence is that witnesses must ordinarily testify to facts, not opinions. [Citation.] An exception exists for expert witnesses. [Citation.] In addition, nonexperts are allowed to state opinions in limited situations. [Citation.] 'Lay opinion testimony is admissible where no particular scientific knowledge is required, or as "a matter of practical necessity when the matters ... observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner." [Citations.]' [Citation.]" (*People v. Williams* (1992) 3 Cal.App.4th 1326, 1332.)

A lay witness's testimony is inadmissible unless the witness has personal knowledge of the subject matter of his or her testimony. (Evid. Code, § 702, subd. (a).) "A lay witness may express an opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony [citation], 'i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed.' [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 889.) "For example, testimony that another person was intoxicated [citation] or angry [citation] or driving a motor vehicle at an excessive speed [citation] conveys information to the jury more conveniently and more accurately than would a detailed recital of the underlying facts. But unlike an

15

expert opinion, the subject matter of lay opinion is 'one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness,' and requires no specialized background. [Citation.]" (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547; see, e.g., *People v. Chatman* (2006) 38 Cal.4th 344, 397 [witness who observed the defendant kicking high school custodian was properly allowed to testify that the defendant " 'seemed to be enjoying it' "]; *People v. Farnam* (2002) 28 Cal.4th 107, 153 [correctional officer's testimony that defendant stood " 'in a posture like he was going to start fighting' " was "based on his personal observations that defendant was being 'very defiant' about the court order and physically stood with his hands at his side and left foot forward"].)

"A witness challenged for lack of personal knowledge *must* nonetheless be allowed to testify *if there is evidence from which a rational trier of fact could find* that the witness accurately perceived and recollected the testimonial events. Once that threshold is passed, it is for the jury to decide whether the witness's perceptions and recollections are credible. [Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 574, italics in original.) The court's admission of lay opinion testimony will not be disturbed absent a clear abuse of discretion. (*People v. Bradley* (2012) 208 Cal.App.4th 64, 83.)

## C. Analysis

The court properly overruled defense counsel's objection to Garcia's redirect examination testimony.[8] Throughout her direct and cross-examination testimony, Garcia tried to convey the "gist" of their conversations about what was going to happen that night. She was supposed to ask Morales for more money. If he refused, Garcia believed Herrera and defendant would rob him. She was willing to rob Morales but knew she

---

[8] Defendant raises an alternate claim of ineffective assistance of counsel in case this court finds that defense counsel failed to preserve the objection to Garcia's redirect examination testimony. We need not reach that issue since counsel immediately objected to Garcia's testimony about defendant's role in the robbery.

could not do it because she was a "girl," and testified that was where defendant and Herrera came in.

Garcia's testimony as a lay witness, and her opinion about what was going to happen that night, were based on her direct personal knowledge of her conversations with Herrera, whatever was discussed in the truck, and the "gist" of her understanding with Herrera and defendant. She was a reluctant witness, but ultimately explained that everyone in the truck knew what was going to happen when they arrived at the market. Indeed, Garcia's testimony was corroborated by Lindsay Constant, who testified that, when Herrera and defendant arrived on the patio, defendant started to grab at his waist as if he had a weapon and complained that Herrera never said that other people would be there. Just moments later, defendant pulled the gun, robbed Perez and Morales at gunpoint, and fired a shot at Perez as he tried to escape. The court properly overruled defendant's objection to Garcia's testimony.

## II. Substantial Evidence of Attempted Murder

Defendant contends there is insufficient evidence to support his conviction for attempted murder of Perez because there was no evidence he made an express threat to kill Perez or that he had the specific intent to kill him.[9]

### A. Substantial Evidence

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is

---

[9] Defendant was charged with the premeditated attempted murder of Perez. The jury found defendant guilty of attempted murder but failed to address the premeditation finding in the verdict form. The court determined defendant's conviction was for attempted second degree murder. However, the crime of attempted murder is not divided into degrees. The prosecution may seek a jury finding that an attempted murder was "willful, deliberate, and premeditated" for purposes of sentence enhancement. (§ 664, subd. (a); *People v. Smith* (2005) 37 Cal.4th 733, 740; *People v. Gonzalez* (2012) 54 Cal.4th 643, 654.)

17

reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

"The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence.  [Citation.]  Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]  'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove [her] guilt beyond a reasonable doubt.'  [Citation.]" (*People v. Bean* (1988) 46 Cal.3d 919, 932–933; *People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)

### B. **Attempted Murder**

"[S]ection 187, subdivision (a) provides:  'Murder is the unlawful killing of a human being … with malice aforethought.'  In order to prove an attempted murder charge, there must be sufficient evidence of the intent to commit the murder plus a direct

but ineffectual act toward its commission. [Citation.] Although malice may be express or implied with respect to a charge of murder, implied malice is an insufficient basis upon which to sustain a charge of attempted murder because specific intent is a requisite element of such a charge. [Citation.] Thus, to sustain a charge of attempted murder, the evidence must demonstrate a deliberate intention unlawfully to kill a fellow human being. [Citation.]" (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.)

"There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.] The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill ....' [Citation.] 'The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind.' [Citation.]" (*People v. Chinchilla*, *supra*, 52 Cal.App.4th at p. 690; *People v. Smith*, *supra*, 37 Cal.4th at p. 741; *People v. Houston* (2012) 54 Cal.4th 1186, 1217–1218.)

## C. Analysis

Defendant contends there is insufficient evidence of express malice and intent to kill because he simply committed an assault when he "fired a shot in [Perez's] general direction" as Perez "started to flee" during "a robbery, at night." Defendant asserts "[t]here was just one shot, fired from a distance, in the general direction of Perez," and there was "no testimony that he heard a bullet pass close to his body."

To the contrary, there is overwhelming evidence to support the jury's finding that defendant had the requisite express malice and intent to kill to support his conviction for the attempted murder of Perez given the entirety of the events in this case. Perez was

19

standing outside the building, talking on the telephone, when he was suddenly accosted by Herrera and defendant.  They knocked him to the ground and got on top of him.  Herrera put a knife to his chest.  Defendant pulled a gun from his waist and placed it against Perez's chest.  One of the men told Perez to " 'give me everything.' "  Perez testified that after they took his wallet, the men told him not to get up or move, or they would shoot him:  "They said if you move we will shoot you."  The two men went back into the house, one man stood near the door, and Perez stayed on the ground.

As defendant and Herrera robbed Morales, Perez decided to escape.  He got up, started to run away, and heard a shot fired when he had run about 25 to 30 meters.  Perez did not see who fired the shot, but he knew that defendant had the gun and believed the shot was fired at him because "I was the one who ran that way and there was no one else."  Morales provided the rest of the details.  Morales testified defendant had the gun, and he saw defendant fire one shot at Perez as he ran away.  "I was there in front when [defendant] fired at [Perez]," and defendant "pointed it towards where [Perez] was running."  As soon as defendant fired the shot, Morales stepped toward Morales to see if he was alright but defendant, who had just fired the shot at Perez, immediately threatened Morales not to move.

There was far more to this case than an errant shot being fired in the general direction of Perez.  Defendant and Herrera robbed Perez and threatened to shoot him unless he stayed on the ground.  The threat was made when defendant was in possession of the gun.  Both Perez and Morales saw only defendant with the gun.  As Perez tried to escape, defendant pointed his gun at Perez and fired a shot at him in Morales's presence.  The fact that defendant fired just one shot, or that Perez did not hear the shot whiz past him, is irrelevant to the overwhelming evidence of defendant's express malice and intent to kill Perez in support of his conviction for attempted murder.

20

## III.    CALCRIM No. 335

Defendant's next issue concerns CALCRIM No. 335, which instructed the jury on the consideration of an accomplice's testimony.  Defendant was charged in counts II and III with the robberies of Perez and Morales.  As set forth above, Garcia pleaded guilty to these same offenses prior to defendant's trial, and she testified against defendant as a reluctant prosecution witness while in custody for those convictions.  Garcia admitted her involvement in the planning and commission of the robberies.[10]  Defendant did not testify in this case.

As relevant to Garcia's testimony, the court instructed the jury with CALCRIM No. 335, the pattern instruction on the consideration of the testimony of an accomplice, which begins as follows:

> *"If the crimes of robbery, as set forth in Counts 2 and 3 of the Information were committed, then Jessica Garcia was an accomplice to those crimes....*  You may not convict the defendant of those crimes based on the testimony of an accomplice alone.…"  (Italics added.)

Defendant argues the italicized portion of the instruction's introductory paragraph was prejudicial because it was based on the presumption that defendant was guilty of the two robberies and implied defendant was the perpetrator of the charged offenses. Defendant has not challenged the rest of the pattern instruction, which correctly stated the legal principles for the jury to consider the testimony of an accomplice – that an accomplice's testimony must be viewed with caution and corroborated by other evidence. (See, e.g., *People v. Houston*, *supra*, 54 Cal.4th at p. 1223.)

We first note defendant has forfeited any claim of error because he failed to object to CALCRIM No. 335 or request any clarifying language.  He agreed with the court and

---

[10] Herrera was charged in a consolidated complaint with defendant and Garcia with attempted murder, robbery and assault with a firearm.  Herrera was not part of defendant's preliminary hearing, he was not charged in the information with defendant, and the record is silent as to the ultimate disposition of the charges against him.

21

the prosecution that the instruction should be given. (See, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) In the alternative, defendant asserts his attorney was prejudicially ineffective for failing to object to the challenged instructional language, counsel's error was prejudicial, and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different…." (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.)

As for the merits of defendant's instructional claim, the court has a sua sponte duty to instruct on the principles governing the law of accomplices, including the need for corroboration, if the evidence at trial suggests that a witness could be an accomplice. (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) "Whether a person is an accomplice is a question of fact for the jury unless the facts and the inferences to be drawn therefrom are undisputed. [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103.) The court must give CALCRIM No. 335 if it concludes the witness is an accomplice as a matter of law or the parties agree about the witness's status as an accomplice. (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1161, disapproved on other grounds in *People v. Cook* (2015) 60 Cal.4th 922.)

Defendant's instructional challenge is based on *People v. Hill* (1967) 66 Cal.2d 536 (*Hill*), where the court cautioned that when "a codefendant has made a judicial confession as to crimes charged, an instruction that as a matter of law such codefendant is an accomplice of other defendants might well be construed by the jurors as imputing the confessing defendant's foregone guilt to the other defendants. [Citation.]" (*Id.* at p. 555.) *Hill* concluded that under such circumstances, it was not error to forego giving accomplice instructions "where the giving of them would unfairly prejudice a codefendant in the eyes of the jury. [Citation.]" (*Ibid.*)

In *People v. Bittaker* (1989) 48 Cal.3d 1046 (*Bittaker*) (disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 920–921), the court acknowledged

22

*Hill's* holding but held it did not apply to facts which are similar to those in the instant case. In *Bittaker*, the defendant and Norris kidnapped and murdered five teenage girls. The defendant was charged with multiple counts of murder, kidnapping, rape, and torture with special circumstances. Norris separately pleaded guilty to five counts of murders, testified for the prosecution pursuant to the terms of his plea agreement, and explained how they committed the crimes. (*Bittaker*, *supra*, at pp. 1062–1063.) The court instructed the jury that Norris was an accomplice as a matter of law and his testimony required corroboration. *Bittaker* rejected the defendant's claim the instruction was prejudicial under *Hill*. *Bittaker* acknowledged that *Hill* addressed a situation where a codefendant was deemed an accomplice, but Norris was not a codefendant and "[u]nder the circumstances of this case … there is no significant danger that the jury would impute Norris's admitted guilt to defendant." (*Bittaker*, *supra*, at p. 1100.)

In this case, *Hill's* concerns are inapplicable and CALCRIM No. 335 was not prejudicial. Garcia was not a codefendant at defendant's trial and the instruction did not state that Garcia was *defendant's* accomplice.[11] Garcia pleaded guilty in a separate proceeding before she testified, and the jury heard other, independent evidence about defendant's participation in the charged offenses that was highly incriminating. As in *Bittaker*, there was no significant danger that the jury in this case would have imputed Garcia's admitted guilt to defendant simply based on the introductory phrase of the instruction. Defendant raised a vigorous defense challenging all aspects of Garcia's testimony and whether he even knew what was going to happen that night. The jury was properly instructed with CALCRIM No. 335 and it was not prejudicial to defendant.

[11] As relevant to both Garcia and Herrera, the jury received CALCRIM No. 373, that "other persons may have been involved in the commission of the crime[s] charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether those other persons have been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime[s] charged."

**IV.** **The Alleged Stipulation at the Sentencing Hearing**

Defendant contends his attorney was prejudicially ineffective at the sentencing hearing because he failed to accept a stipulation purportedly offered by the prosecutor, to strike the section 12022.53, subdivision (c) enhancement for the personal and intentional discharge of the firearm in the commission of the robberies. Defendant asserts that counsel's failure to accept the offered stipulation was prejudicial because it would have resulted in a lesser sentence. As we will explain, the record of the sentencing hearing refutes defendant's characterization of this alleged stipulation.[12]

**A.** **The Court's Tentative Findings**

As to all counts, the jury found true the section 12022.53, subdivision (c) enhancement, that defendant personally and intentionally discharged a firearm in the commission of the attempted murder of Perez, the robbery of Perez, and the robbery of Morales. Section 12022.53, subdivision (c) states that upon finding that enhancement true, the court "shall" impose an additional and consecutive term of 20 years.

When the court convened the scheduled sentencing hearing, it advised the parties that it intended to impose the upper term for count I, attempted murder of Perez, with a consecutive term of 20 years for the section 12022.53, subdivision (c) enhancement for defendant's discharge of the firearm. However, the court was concerned about whether that same enhancement could be imposed for both robbery convictions. "The Court believes that the facts are such that they can be argued both ways that it is either a continuing course of conduct, the robbery through the shooting, or whether the facts appear to this Court to be a distinct and separate violation. If it's … a distinct and separate violation then, again, it should run consecutive in this matter because it's a separate crime."

---

[12] We will fully review the court's findings at the sentencing hearing since they are relevant to additional issues raised in this appeal.

24

The court was also concerned whether the jury's finding that defendant personally and intentionally "discharged" a firearm in the commission of the two robberies was correct. The court thought that the section 12022.53, subdivision (b) "use" enhancement might have been more appropriate for both robberies since only one shot was fired.[13] The court asked the parties what the appropriate remedy would be in such a situation, whether it could modify the subdivision (c) "discharge" enhancement to a subdivision (b) "use" finding, or whether the modification of the jury's finding would implicate *Apprendi v. New Je*rsey (2000) 530 U.S. 466 (*Apprendi*).

The prosecutor replied the court could impose consecutive firearm enhancements for both counts II and III because defendant discharged the firearm in the commission of both robberies: he robbed Perez, warned him to stay down or he would be shot, moved on to Morales, and "[a]t that point, while committing the [robbery] on [Morales], the defendant then saw [Perez] get up and move. At that point there's a [robbery] continuing to happen on the second [victim]," and then the attempted murder occurred.

The prosecutor was concerned about the court's possible dismissal of the firearm enhancement, and further stated:

> "I would be willing to stipulate with the defense, if the defense wants to stipulate to that, that that should be [section] 12022.53(b) despite the – the jury's finding, because I believe [subdivision] (b) would be inclusive in the subdivision (c). I don't agree with the Court that it's [section] 654. So if the defense wants to stipulate that that should be in the [subdivision] (b) section and it should be one-third of the 10 years instead of the 20 years, that I would be in agreement with. If there is not an agreement as to that, then I think we need to brief the issue."

The prosecutor argued a stipulation would not violate *Apprendi* or prejudice the defense. The court replied that defendant would suffer prejudice if he prematurely

---

[13] Section 12022.53, subdivision (b) provides for a 10-year enhancement if the defendant "personally uses a firearm" in the commission of the offense.

25

accepted such a stipulation. The court explained that if the wrong enhancement was alleged, and it lacked legal authority to modify the jury's finding, then it would have to strike the entire enhancement instead of imposing a lesser term.

Defense counsel said he might be willing to stipulate after he talked to defendant, but "I do think it needs to be briefed really because of the ramifications here" and asked for further time.

The court set a briefing schedule and asked the parties to address whether section 12022.53, subdivisions (b) or (c) were the appropriate enhancements for counts II and III, the robberies of Perez and Morales, and the appropriate remedy if the jury's finding on the subdivision (c) enhancement was incorrect.

**B. The Sentencing Hearing**

The prosecution submitted a sentencing brief and argued the court could impose the section 12022.53, subdivision (c) enhancements as to both counts II and III. Defense counsel did not submit a brief.

At the continued sentencing hearing, the court made lengthy findings that there were multiple aggravating circumstances and no mitigating circumstances, and indicated its proposed sentence. As to count I, attempted murder of Perez, the court intended to impose the upper term of nine years, doubled to 18 years as the second strike sentence, plus consecutive terms of 20 years for the section 12022.53, subdivision (c) firearm enhancement, and five years for the prior serious felony enhancement.

As to count II, the robbery of Perez, the court intended to impose consecutive sentences and found section 654 did not apply. The court found the offense was a separate act of violence and "there was a distinct delay between the robbery and the shooting of the gun at the victim as he fled, which to me shows a separate criminal intent in addition to it being … a separate act of violence against the victim." The court

26

intended to impose one year for count II (representing one-third the midterm) doubled to two years as the second strike sentence.

The court also addressed its previous concerns about the firearm enhancements. The court found section 12022.53, subdivision (c) was the correct enhancement for the robbery convictions, and that multiple firearm enhancements could be imposed for multiple offense against several victims even if a single shot was fired, based on *In re Tameka C.* (2000) 22 Cal.4th 190 (*Tameka C.*). The court found that when defendant fired the shot, he "facilitated both the initial robbery, the attempted murder and the robbery of the second victim all at one time." The court intended to impose one-third of the 20-year firearm enhancement for count II, which was eight years eight months.

The court stated the same analysis applied for count III, the robbery of Morales, and it would impose two years for the robbery (double of one-third the midterm) plus eight years eight months for the firearm enhancement (one-third the 20-year enhancement).

The court asked the parties for argument. The prosecutor concurred with the tentative ruling. Defense counsel said: "My client wants me to submit it on your tentative, your Honor, that's fine."

The court adopted its tentative ruling and sentenced defendant to an aggregate term of 60 years four months.

C. **Analysis**

Defendant contends his defense counsel was prejudicially ineffective for failing to immediately agree to the prosecutor's proposed stipulation at the initial sentencing hearing, to reduce the firearm enhancement to a finding under section 12022.53, subdivision (b), because he would have received a lesser term. Defendant also complains his attorney failed to file supplemental briefing on the matter or raise the proposed

27

stipulation at the continued sentencing hearing. Defendant asserts counsel's failure was prejudicial because he would have received a lesser sentence.

Defendant's argument is based upon a false premise. Generally, the court has the discretion whether to accept or reject stipulations. (See e.g., *People v. Hall* (1980) 28 Cal.3d 143, 152–153, overruled on other grounds in *People v. Newman* (1999) 21 Cal.4th 413, 422, fn. 2, abrogated by constitutional provision on other grounds as stated in *People v. Valentine* (1986) 42 Cal.3d 170, 177–182; *People v. Bonin* (1989) 47 Cal.3d 808, 848–849; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.) However, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it…." (*Old Chief v. United States* (1997) 519 U.S. 172, 186–187.)

In this case, the People pleaded and proved that defendant personally and intentionally discharged a firearm in the commission of the offenses within the meaning of section 12022.53, subdivision (c). The court's questions were whether that was the correct subdivision, and whether multiple enhancements could be imposed, since defendant only fired one shot. In raising this question, the court was also concerned whether it had the discretion to modify the jury's findings to a lesser enhancement, if a modification implicated the jury's findings under *Apprendi*, or the enhancement must be stricken as to one or both robbery convictions. In an attempt to avoid the complete elimination of the enhancement, the prosecutor quickly offered to stipulate to the court's ability to modify the jury's finding, and argued a stipulation would avoid any *Apprendi* error and not be prejudicial to defendant. The court disagreed about the potential prejudice since the entire enhancement might have to be stricken.

More importantly, however, the court correctly concluded that it could impose multiple section 12022.53, subdivision (c) enhancements for defendant's discharge of the firearm based on the firing of a single shot. The sentencing scheme set forth in section

28

12022.53 is "unfettered by section 654" and does not prevent imposition of multiple enhancements for the discharge of a firearm on counts involving multiple victims but a single act. (*People v. Frausto* (2009) 180 Cal.App.4th 890, 898 & fn. 4.) "[S]ection 12022.53 calls for multiple enhancements to be imposed when there are several victims but only one injury. [Citation.]" (*Id*. at p. 899; *People v. Oates* (2004) 32 Cal.4th 1048, 1054–1055.)

At the sentencing hearing, the court cited *Tameka C.*, *supra*, 22 Cal.4th 190 when it decided it could impose the firearm enhancements. In *Tameka C.*, the minor shot her intended victim and then fired gunshots in the direction of three police officers. She missed the officers, but shattered the glass in a door of a nearby hotel, and a shard of glass struck a child inside the building. The minor may not have known the child was present. The juvenile court found the minor committed assault with a firearm against the child and the three officers. The minor challenged the imposition of separate firearm enhancements for each count. (*Id.* at pp. 192, 197.) *Tameka C.* held the enhancements were properly imposed: "The Legislature has expressed its purpose of deterring unlawful firearm use and avoiding the ensuing injury to the public, and we have recognized that the number of victims exposed to the use of a firearm is relevant to the defendant's culpability. [Citations.] We therefore reject defendant's contention that section 12022.5, subdivision (a), should be interpreted to provide that even if a single shot facilitates the commission of more than one felony, only one firearm-use enhancement may be imposed. Instead, we conclude that [minor] used a firearm in the commission of each of the multiple assaults upon the three officers and [the child], even though such use occurred on a single occasion and apparently involved a single act." (*Id.* at pp. 199–200.)

In this case, even if defense counsel had immediately agreed to the prosecutor's proposed stipulation, it is clear the court was not going to accept it without further consideration of the matter. At the continued sentencing hearing, the court made

29

extensive findings and correctly concluded that multiple firearm enhancements were appropriate based on *Tameka C.*, *supra*, 22 Cal.4th 190. Defense counsel's failure to accept the stipulation, file further briefing, and raise the matter at the sentencing hearing were not prejudicial given the applicable law, and the court's obvious disinclination to accept the stipulation without determining the legally correct sentence in this case. A trial counsel is not required to undertake futile acts or file meritless motions simply to withstand later claims of ineffective assistance. (*People v. Anderson, supra,* 25 Cal.4th 543, 587.)

## V. <u>Consecutive Sentences for the Attempted Murder and Robbery of Perez</u>

As explained in section IV(B), *ante*, the court imposed consecutive sentences for counts I and II, the attempted murder and robbery of Perez. Defendant asserts that section 654 prohibited consecutive sentences because both offenses were committed pursuant to the single objective of stealing and retaining Perez's property since the robbery of Perez was not yet complete. Defendant asserts the "only reasonable explanation" why he fired the shot at Perez was because he was "either trying to prevent Perez from escaping, or to scare him so badly that he would not report the incident," the shot was fired to perpetuate the robbery, and he did not have the separate intent to kill him.

### A. <u>Section 654</u>

Section 654 "prohibits punishment for two crimes arising from a single indivisible course of conduct. [Citation.] If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.] The defendant's intent and objective are factual questions for the

30

trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence.  [Citation.]”  (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525–1526.)

In *People v. Nguyen* (1988) 204 Cal.App.3d 181 (*Nguyen*), the defendant and his partner robbed a market and the defendant’s partner took the store clerk to the backroom. (*Id*. at p. 190.)  While the defendant was at the store’s cash register, his partner took the store clerk’s valuables, and then forced him to lie on the floor in an attempt to forestall any resistance.  Once the store clerk was on the ground, the defendant’s partner shot him. (*Ibid.*)

*Nguyen* held that under section 654, the crimes of robbery and attempted murder should be sentenced separately:  “This act [of attempted murder] constituted an example of gratuitous violence against a helpless and unresisting victim which has traditionally been viewed as not ‘incidental’ to robbery for purposes of Penal Code section 654. [Citations.]”  (*Nguyen*, *supra*, 204 Cal.App.3d at p 190.)

> “[A]t some point the means to achieve an objective may become so extreme they can no longer be termed ‘incidental’ and must be considered to express a different and a more sinister goal than mere successful commission of the original crime.”  (*Id*. at p. 191.)

*Nguyen* also rejected the defendant’s argument that section 654 barred multiple sentences “because the facts suggest the clerk was shot in order to eliminate him as a witness or to facilitate the assailants’ escape.  Perhaps; but at some point the means to achieve an objective may become so extreme they can no longer be termed ‘incidental’ and must be considered to express a different and a more sinister goal than mere successful commission of the original crime.”  (*Nguyen*, *supra*, 204 Cal.App.3d at p. 191.)  “It is one thing to commit a criminal act in order to accomplish another; Penal Code section 654 applies there.  But that section cannot, and should not, be stretched to cover *gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense….*”  (*Ibid.*, italics added.)

31

In *People v. Cleveland* (2001) 87 Cal.App.4th 263 (*Cleveland*), the defendant was angry because an elderly man refused to give him money. He entered the man's apartment and beat him with a large piece of wood until the man became unconscious. A neighbor saw the defendant walk out with the man's Walkman radio. The defendant was convicted of attempted murder, robbery, and assault with a deadly weapon. (*Id*. at pp. 266–267.) *Cleveland* held separate sentences could be imposed for the robbery and attempted murder of the same victim. *Cleveland* quoted *Nguyen* with approval and held there was substantial evidence to support the conclusion the defendant "harbored divisible intents in committing two separate crimes …." (*Cleveland*, *supra*, at p. 272, fn. omitted.) "We do not agree with [the defendant] that both crimes were committed pursuant to the intent to rob [the victim] of his Walkman. As the trial court observed, the amount of force used in taking the Walkman was far more than necessary to achieve one objective. [The defendant] repeatedly hit his 66-year-old feeble, unresisting victim on the head and body with a two-by-four board. [The defendant] struck [the victim] until the board broke and left him unconscious. While it is true that attempted murder can, under some circumstances, constitute the 'force' necessary to commit a robbery, here, it was not the necessary force…." (*Id.* at pp. 271–272.)

## B. <u>Analysis</u>

We find the analysis in *Nguyen* and *Cleveland* applicable to the consecutive sentences imposed in this case for the robbery and attempted murder of Perez, and there is substantial evidence that defendant had multiple and independent objectives. Defendant and Herrera had already knocked down and robbed Perez, and moved on to robbing Morales. Defendant's act of shooting and attempting to murder Perez was unnecessary to accomplish his previous objective of robbing Perez, and the attempted murder was not incidental to Perez's robbery. The record supports the inference that defendant did not attempt to kill Perez simply to take his property and escape to a place

32

of safety, but with a separate intent to evade arrest and prosecution by eliminating a witness. Defendant's attempted murder of Perez also served to prevent Morales from resisting or stop all of the suspects from leaving.

Defendant argues the robbery of Perez was not complete at the time at the time of the shooting because he and Herrera had not reached a temporary place of safety. Defendant is correct that a robbery may not be considered complete until the perpetrator reaches a temporary place of safety. (*People v. Bigelow* (1984) 37 Cal.3d 731, 753–754.) However, the test of a violation of section 654 is not whether the crime was complete, but is whether the perpetrator had separate intents and objectives. (See *Nguyen, supra,* 204 Cal.App.3d at p. 193 ["If the trier of fact determines the crimes have different intents and motives, multiple punishments are appropriate. This is so notwithstanding that for purposes of the felony-murder rule the robbery is still considered to be ongoing"].) "The moment at which a defendant committed all of the elements of an offense is immaterial in applying Penal Code section 654." (*People v. Perry*, *supra*, 154 Cal.App.4th at p. 1527.) Therefore, the fact that the robbery may have been incomplete at the time that defendant attempted to murder Perez does not insulate defendant under section 654.

As in *Nguyen* and *Cleveland*, we conclude that even where a defendant's initial objective appears to be the taking of another person's property, evidence of violence or any other conduct by the defendant unnecessary to accomplish the taking may support a finding that the defendant developed a separate and different, though perhaps simultaneous intent.

## VI. CALCRIM No. 3148 and the Firearm Enhancement for Count III

Defendant raises two issues as to the jury's finding on the section 12022.53, subdivision (c) firearm enhancement attached to count III, that he personally and intentionally discharged a firearm in the commission of the robbery of Morales.

33

First, defendant argues the court had a sua sponte duty to modify CALCRIM No. 3148, the pattern instruction which stated the elements of the firearm enhancement. Defendant contends the court should have instructed the jury that the discharge of the firearm had a "facilitative nexus" to the robbery of Morales, consistent with the California Supreme Court's discussion of the concept in *People v. Bland* (1995) 10 Cal.4th 991 (*Bland*). Defendant concedes he did not object to the pattern instruction, but argues he has not forfeited review of the issue because the court's failure to modify the instruction violated his substantial rights and omitted an essential element of the enhancement.

Second, defendant again relies on *Bland*, *supra*, 10 Cal.4th 991 and argues the court should not have imposed that enhancement to count III, the robbery of Morales. Defendant asserts there is insufficient evidence that defendant's act of firing a single gunshot as Perez tried to run away had a "facilitative nexus" to the robbery of Morales.

In this section, we will address defendant's instructional challenge to the enhancement, assuming without deciding that the alleged error may have affected his substantial rights. (See, e.g., § 1259; *People v. Montoya* (1994) 7 Cal.4th 1027, 1047) In section IV, *post*, we will address the sufficiency of the evidence for the firearm enhancement.

A. **The Charges**

In counts II and III, defendant was charged and convicted of the robberies of Perez and Morales. " ' "[R]obbery ... is not confined to a fixed *locus,* but is frequently spread over a considerable distance and varying periods of time." ' [Citations.] 'The crime is not divisible into a series of separate acts. Defendant's guilt is not to be weighed at each step of the robbery as it unfolds. The events constituting the crime of robbery, although they may ... take some time to complete, are linked by a single-mindedness of purpose.' [Citation.] In other words, the crime of robbery begins with the commission of any of the

34

defined elements and is completed when all of the remaining elements have been committed. It is a continuing offense that concludes not just when all the elements have been satisfied but when the robber reaches a place of relative safety. [Citation.]" (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059.)

Section 12022.53, subdivision (c) mandates the imposition of an enhancement for "any person who, in the commission of a felony specified in subdivision (a), personally and intentionally discharges a firearm...." "[A] firearm is discharged 'in the commission of' a felony within the meaning of section 12022.53 … if the underlying felony and the discharge of the firearm are part of one continuous transaction .… Temporal niceties are not determinative and the discharge of a gun before, during, or after the felonious act may be sufficient if it can fairly be said that [it] was a part of a continuous transaction. For the same reason that chronology is not a determining factor, the number of bullets used in a shooting is not dispositive when the rounds fired can fairly be said to be part of a continuous transaction." (*People v. Frausto*, *supra*, 180 Cal.App.4th at p. 902; *People v. Masbruch* (1996) 13 Cal.4th 1001, 1007.) The enhancement "attaches to an offense, regardless of its nature, if the firearm use [or discharge] aids the defendant in completing one of its essential elements. [Citation.]" (*People v. Masbruch*, *supra*, 13 Cal.4th at pp. 1012–1013.)

## B. The Instructions

The jury received CALCRIM No. 1600 on the elements of robbery; that the People had the burden of proving beyond a reasonable doubt all the elements of the offense, including that the property "was taken against [the victim's] will" and "the defendant used force or fear to take the property or *to prevent the [victim] from resisting....*" (Italics added.)

As relevant to the section 12022.53, subdivision (a) firearm enhancement, the jury was instructed on the elements with the pattern instruction of CALCRIM No. 3148:

35

"*If you find the defendant guilty of the crimes charged in Counts 1, 2 or 3, you must then decide whether for each crime the People have proved the additional allegation that the defendant personally and intentionally discharged a firearm during that offense.*

"You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.

"To prove this allegation, the People must prove that, one, the defendant personally discharged a firearm *during the commission* or attempted commission *of the crime*, and two, the defendant intended to discharge the firearm.…

"The People have the burden of proving each allegation beyond a reasonable doubt.  If the People have not met this burden, you must find the analysis [*sic*] has not been proved."  (Italics added.)

## C. *Bland*

Defendant contends the court had a sua sponte duty to modify CALCRIM No. 3148 to address the "facilitative nexus" element of the firearm enhancement which, he asserts, was mandated by the California Supreme Court in *Bland*, *supra*, 10 Cal.4th 991.

*Bland* involved a factually inapposite situation, about whether the defendant was "armed" with a firearm discovered in his house when he was not present.  In that case, officers searched the defendant's house and found a large amount of rock cocaine in a closet.  In the same room they found several firearms under the bed, including an assault weapon.  The defendant was sitting in a police car outside the house during the search. He was convicted of two counts of possession of cocaine base for sale, with a section 12022, subdivision (a)(2) enhancement for being "armed" with an assault weapon "in the commission" of the drug offense.  (*Bland*, *supra*, 10 Cal.4th at pp. 995–996.)

*Bland* upheld the jury's finding on the enhancement and held that a defendant is "armed" if he or she "has the specified weapon available for use, either offensively or defensively.  [Citations.]"  (*Bland*, *supra*, 10 Cal.4th at pp. 997, 999.)  For a defendant to

36

be armed "in the commission" of an offense, he need only have "a weapon available at any time during the felony to aid in its commission …." (*Id.* at p. 999.) "Therefore, by its terms, [the enhancement] applies whenever during the commission of the underlying felony the defendant had an assault weapon available for use in the furtherance of that felony. [Citation.]" (*Id.* at p. 1001.) Since drug possession is a crime that "continues throughout the time that the defendant has possession of the unlawful drugs, it follows that [the enhancement] would apply to a defendant who has been found guilty of felonious drug possession and who, at some point during the illegal drug possession, had an assault weapon available for use in furtherance of the drug offense." (*Id.* at p. 1001.)

*Bland* affirmed the jury's finding on the arming enhancement and did not hold the instructions were erroneous or failed to state an element. (*Bland*, *supra*, 10 Cal.4th at pp. 1004–1006.) "From evidence that the assault weapon was kept in defendant's bedroom near the drugs, *the jury could reasonably infer* that, at some point during the felonious drug possession, defendant was physically present with both the drugs and the weapon, giving him ready access to the assault rifle to aid his commission of the drug offense." (*Id.* at p. 1000, italics added.)

In its analysis of the enhancement, however, *Bland* compared the state provisions to federal firearm statutes:

> "[C]ontemporaneous possession of illegal drugs and a firearm will satisfy the statutory requirement of being 'armed with a firearm in the commission' of felony drug possession only if the evidence shows a nexus or link between the firearm and the drugs. The federal courts, in interpreting the federal counterpart to California's weapons enhancement law [citation], have described this link as *a 'facilitative nexus'* between the drugs and the gun. [Citation.] Under federal law, which imposes specified prison terms for using or carrying a firearm ' "during and in relation to" ' a crime of drug trafficking, 'the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement *cannot be the result of accident or coincidence*.' [Citation.] So too in

37

California." (*Bland*, *supra*, 10 Cal.4th at p. 1002, first italics added, second italics in original.)

*Bland* reiterated that with respect to felony drug possession, a defendant is armed in the commission of the offense "so long as the defendant had the firearm available for use in furtherance of the drug offense at some point during the defendant's possession of the drugs. Thus, by specifying that the added penalty applies only if the defendant is armed with a firearm 'in the commission' of the felony offense, section 12022 implicitly requires both that the 'arming' take place *during* the underlying crime and that it have some '*facilitative nexus*' to that offense. Evidence that a firearm is kept in close proximity to illegal drugs satisfies this 'facilitative nexus' REQUIREMENT: a firearm's presence near a drug cache gives rise to the inference that the person in possession of the drugs kept the weapon close at hand for 'ready access' to aid in the drug offense." (*Bland*, *supra*, 10 Cal.4th at p. 1002, original italics.)

In *People v. Pitto* (2008) 43 Cal.4th 228 (*Pitto*), defendant relied on *Bland* and argued the trial court had a sua sponte duty to instruct the jury on "facilitative nexus" as an element of the section 12022 arming enhancement. The defendant in *Pitto* was arrested after officers searched his van and found methamphetamine in a duffel bag behind the driver's seat. An unloaded weapon and ammunition were one foot away from the bag. The defendant claimed his possession of the gun was unrelated to the drugs because he purchased the gun when he was depressed and contemplated committing suicide. (*Id*. at pp. 233–234.) The appellate court held the jury should have been instructed about the requirement for a nexus between the firearm enhancement and the underlying offense, and the error was not harmless. (*Id*. at p. 235.)

*Pitto* affirmed defendant's conviction and "disagree[d] that instructional error occurred." (*Pitto*, *supra*, 43 Cal.4th at p. 239.) *Pitto* characterized the facts as a "classic case for finding the defendant was armed while possessing and transporting a controlled substance." (*Id*. at p. 238.) In doing so, *Pitto* reaffirmed *Bland's* conclusion that the

38

substance of the section 12022 arming enhancement was the firearm's " 'availabil[ity] for use, either offensively or defensively.'[Citation.]" (*Pitto*, *supra*, 43 Cal.4th at p. 236.) "*Bland* made clear that it did not impose an 'intent requirement' under section 12022, or provide that the purpose with which the gun was placed near the drugs negates the 'facilitative nexus' that arming requires. [Citation.] We adhere to this view." (*Id.* at pp. 239–240.)

Pitto concluded defendant was armed in the commission of the offense because "[r]egardless of his original motive, the opportunity and incentive to later resort to using the gun in perpetrating the crime is the same. And his deliberate placement of the gun and drugs in juxtaposition to each other negates any claim of accident or coincidence under *Bland* .…" (*Pitto*, *supra*, 43 Cal.4th at p. 240.) *Pitto* held the appellate court erred in determining the trial court had a sua sponte duty to instruct beyond the provisions of the pattern instruction "that there must be a facilitative nexus between the possession of illegal drugs and a firearm.…" (*Id.* at pp. 240, 232.) A "rational jury could have concluded beyond a reasonable doubt" that the gun was available to protect defendant during a drug sale, guard against theft of the drugs, or ward off the police. (*Id.* at p. 238.)

## D. <u>Analysis</u>

Defendant contends that as to the robbery of Morales, CALCRIM No. 3148 was constitutionally deficient because it failed to define an element of the enhancement as mandated by *Bland*, *supra*, 10 Cal.4th 991: That the jury had to find that defendant's discharge of the firearm as Perez ran away had a "facilitative nexus" to the robbery of Morales. Defendant argues this instructional element was particularly relevant to this case since the single shot was fired in reaction to Perez's escape and after Morales had been robbed.

As explained in *Pitto*, however, *Bland's* discussion of "facilitative nexus" did not impose a new element for firearm enhancements or require modification of the pattern

39

instructions.  Instead, it addressed the various inferences that might reasonably be drawn from the distinctive facts of that case, since the defendant was not present and in police custody when the drugs and weapons were discovered.  In doing so, *Bland* referred to terminology used by federal courts to describe the requirement that the firearm be available for use in furtherance of the drug offense.  Neither *Bland* nor *Pitto* held the arming enhancements in those cases should have been stricken because the instructional language was inadequate or failed to include the "facilitative nexus" element, and *Pitto* expressly rejected a claim of instructional error similar to defendant's assertion.  (*Bland*, *supra*, 10 Cal.4th at pp. 1005–1006; *Pitto*, *supra*, 43 Cal.4th at p. 234.)  In both cases, the Supreme Court found the evidence and instructions were sufficient for the jury to find the weapons were in proximity to the drugs, and therefore their presence was not accidental or coincidental.  (*Bland*, *supra*, 10 Cal.4th at pp. 1003, 1006; *Pitto*, *supra*, 43 Cal.4th at p. 240.)  "The discussion in an appellate decision is directed to the issue presented.  The reviewing court generally does not contemplate a subsequent transmutation of its words into jury instructions and hence does not choose them with that end in mind."  (*People v. Colantuono* (1994) 7 Cal.4th 206, 222, fn. 13.)

## E.  Harmless Error

Even assuming the court had a sua sponte duty to instruct on "facilitative nexus" as an element of the enhancement, any such error is subject to review under *Chapman v. California* (1967) 386 U.S. 18.  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 325–326.)  "Omission or removal of a single element from the jury is not ... 'a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal ....' [Citations.]"  (*People v. Sakarias* (2000) 22 Cal.4th 596, 625.)  "We may affirm the jury's verdicts despite the error if, but only if, it appears beyond a reasonable doubt that the error did not contribute to the particular verdict at issue.  [Citations.]  In particular, we may affirm despite the error if the jury that rendered the verdict at issue

40

could not rationally have found the omitted element unproven; the error is harmless, that is, if the record contains no substantial evidence supporting a factual theory under which the elements submitted to the jury were proven but the omitted element was not. [Citation.]" (*Ibid.*)

We conclude that any instructional error was harmless beyond a reasonable doubt based on the entirety of the instructions. Unlike the distinct circumstances in *Bland* and *Pitto*, in which a facilitative nexus was invoked to evaluate the accessibility and proximity of a weapon during the commission of the crime, the firearm in this case was physically possessed and used during the commission of the offenses. Moreover, there was nothing accidental or coincidental about the shooting. Defendant was in actual possession of a firearm, and discharged that firearm, during the entirety of the criminal acts in this case. As to the elements of robbery, the jury was instructed that the offense required the defendant to use force or fear to take the property or "*prevent the [victim] from resisting ….*" (Italics added.) As for the firearm enhancement, the jury was instructed that it had to determine whether defendant personally and intentionally discharged the firearm "*during that offense*," and the People had to prove he personally discharged the firearm "*during the commission* or attempted commission of the crime.…" (Italics added.) The "facilitative nexus" aspect discussed in *Bland* was inherent in these instructions – the jury had to determine whether defendant discharged the firearm at the time of the commission of the robbery of Morales, and the crime of robbery included the use of force or fear to prevent the victim from resisting. There was evidence from which the jury could have determined that defendant was still in the process of robbing Morales when he fired at Perez, such that he used force or fear to prevent Morales from resisting.

## VII.  <u>Imposition of the Firearm Enhancement for Count III</u>

Defendant's final issue again concerns the section 12022.53, subdivision (c) enhancement imposed for his discharge of the firearm in the commission of count III, the

41

robbery of Morales. Aside from the instructional issue addressed above, defendant again relies on *Bland* and *Pitto*, and contends the enhancement should be stricken because there is no evidence the shot he fired at Perez had a facilitative nexus to the robbery of Morales.

Whether a defendant used or discharged a firearm in the commission of an enumerated offense is for the trier of fact to decide. (*People v. Frausto*, *supra*, 180 Cal.App.4th at pp. 896–897.) We review the sufficiency of the evidence to support an enhancement using the same standard we apply for conviction of the substantive offense. (*Ibid*.)

As we have explained, "a firearm is discharged 'in the commission of' a felony within the meaning of section 12022.53 … if the underlying felony and the discharge of the firearm are part of one continuous transaction …. Temporal niceties are not determinative and the discharge of a gun before, during, or after the felonious act may be sufficient if it can fairly be said that [it] was a part of a continuous transaction." (*People v. Frausto*, *supra*, 180 Cal.App.4th at p. 902.)

In *People v. Fierro* (1991) 1 Cal.4th 173 (disapproved on a different point in *People v. Letner and Tobin* (2010) 50 Cal.4th 99), the defendant first robbed the wife and then, before leaving, murdered and robbed her husband. The defendant argued the gun use finding should be stricken as to the robbery of the wife, because he did not display or personally use the gun during that robbery. (*Fierro*, *supra*, at pp. 226–227.) *Fierro* upheld the jury's finding on the firearm enhancement and held "the jury could reasonably have inferred that defendant used the gun against the murder victim to facilitate his escape or to prevent his identification as the robber of [wife]." (*Id*. at p. 227.) *Fierro* explained that "[i]n light of the legislative purpose to discourage the use of firearms, *it would appear to be immaterial whether the gun use occurred during the actual taking or*

42

*against the actual victim,* so long as it occurred 'in the commission' of the robbery. [Citation.]" (*Id.* at p. 226, italics added.)

Defendant effectively renews his arguments in issue V, *ante*, that the firearm enhancement could only be found true for count III if there was a "facilitative nexus" between the firing of the single shot at Perez and the robbery of Morales. As we have explained, however, the concerns addressed in *Bland* and *Pitto* are not present in this case because defendant's discharge of the firearm was not accidental or coincidental to the robbery. He was escorting Morales out of the building and still in the process of the robbery when he spied Perez's attempted escape, fired the shot in Morales's presence, and then threatened to harm Morales when he tried to check on Perez's welfare. Defendant thus discharged the firearm "in the commission" of the robbery of Morales.

## DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:

_____
KANE, Acting P.J.

_____
FRANSON, J.

43